**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| SUSAN SHAER,<br><br>                            Plaintiff,<br><br>    -against-<br><br>THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., THE ESTATE OF ANDY WARHOL, VINCENT FREMONT, VINCENT FREMONT ENTERPRISES, THE ANDY WARHOL ART AUTHENTICATION BOARD, INC., JOHN DOES 1-20, JANE DOES 1-10, and RICHARD ROES 1-10,<br><br>                        Defendants. | Case No.<br><br>COMPLAINT |

Plaintiff Susan Shaer (formerly Susan Mearns and referred to herein as *Mearns*), by her undersigned attorneys, makes the following allegations against Defendants The Andy Warhol Foundation for the Visual Arts, Inc. (*The Foundation*), The Estate of Andy Warhol (*The Estate*), Vincent Fremont, Vincent Fremont Enterprises (*Fremont Enterprises*), The Andy Warhol Art Authentication Board, Inc. (*The Authentication Board* or *The Board*), John Does 1-20, Jane Does 1-10, and Richard Roes 1-10 (collectively, *Defendants*), based upon the investigation conducted by and under the supervision of Plaintiff and her counsel, which included reviewing information from numerous public sources concerning the subject matter of the claims alleged below – including, among other things, government filings, magazines, books, newspapers and other media reports – in order to sufficiently plead Plaintiff's claims. The investigation also included interviewing a significant number of people who are knowledgeable about Defendants' conspiracy and Warhol's artistic methods (including individuals who worked closely with Warhol during the relevant time period). Plaintiff believes that further substantial evidentiary

240959_1.DOC

support will exist for the allegations set forth herein after reasonable discovery.

## **INTRODUCTION**

1.      This antitrust action arises out of a 20-year scheme of fraud, collusion and manipulation by, between and among Defendants to control the market in works of art by the late Andy Warhol, one of the most prolific and innovative artists of the 20th century.  Plaintiff is one of many victims of this conspiracy to monopolize both the market for authentication of Warhol artwork as well as the market for buying and selling such artwork.  She owns a painting (the *Mearns Painting*) that Defendants solicited for submission to the Authentication Board with the sole intention of mutilating it, thereby eliminating it from the marketplace and concealing primary evidence of Warhol's working methods from the 1960's.

2.      While Defendants have conspired to rewrite Warhol's history by branding paintings they know to be authentic as "fakes,"[1] the truth is that the *Mearns Painting*, and the series of which it is a part, are not only authentic but were sufficiently important to Warhol himself that he personally chose another, substantially identical, painting from this series as the cover image on the first catalogue of his works that he co-published in 1970. In 2002, Defendants successfully sought out, and then defaced, this second painting, as they have done with others from this series. Two years later, with full knowledge of what the result of their examination would be, they wrote to Mearns, urging her to submit her painting.

3.      For many years, Defendants have attempted to cover their tracks with legal threats and by silencing Warhol's contemporaries who witnessed how Warhol actually worked. Thus, the very institutions and individuals -- the self-described Warhol "experts" -- entrusted with protecting Warhol's legacy are deliberately destroying seminal work from the 1960's.

---

[1] Conversely, Defendants have also knowingly "authenticated" works known to be fake.

4.      Since Warhol's death in 1987, sales of his artwork have dominated the multi-billion dollar market for modern and contemporary art.  In 2006, the mean estimate of a Warhol at auction was approximately $442,000, according to Artnet, a New York-based art-database service, but his works routinely fetch even more astronomical sums.  In May 2007, for example, a single Warhol silkscreen painting, his 1963 *Green Car Crash*, sold for $71.7 million.  Another Warhol, *Lemon Marilyn*, sold for $28 million on the same day.  In late 2009, Warhol's *200 Dollar Bills* sold for $43.8 million.

5.      Warhol's *factory*-style of art production is well-documented in various books, documentaries, films and art exhibits.  In contrast to many modern and contemporary artists, Warhol viewed himself as the head of a company whose product was art.  In his own words, "making money is art and working is art and good business is the best art."

6.      By the time of his death, Warhol had successfully attained his goal – his "business" had assets in excess of *$500 million*, consisting mostly of artwork he had created in his production facility that, quite appropriately, was named the *Factory*.  At this time, two men, Fred Hughes (the executor of Warhol's Estate, who himself died in 2001) and Vincent Fremont (the alternate executor) controlled these extremely valuable assets.  However, Hughes and Fremont were also in the unique (and conflicted) position of being asked to authenticate other works attributed to Warhol before they would be sold.

7.      Months after Warhol's death, as stipulated in his will, Hughes and Fremont formed The Foundation as a not-for-profit corporation. The Foundation was to receive hundreds of millions of dollars in Warhol art from The Estate.  Fremont became The Foundation's exclusive sales agent for paintings, determining who could buy a Warhol – and at what price – and commanding a lavish 25% commission on each and every sale (plus substantial expenses).

8.     In the years that followed, Fremont and Hughes were also able to control who could sell a Warhol by authenticating – or by failing to authenticate – works that were submitted to The Foundation for examination.  At all times since its formation, The Foundation has maintained substantial holdings of Warhol artwork from The Estate and exercised tremendous leverage over the market for Warhol artwork by deciding which galleries will get to exhibit, and which dealers will get to sell, works from The Foundation's substantial and valuable collection.

9.     In 1995, The Foundation and Fremont, together with their lawyers, Carter Ledyard & Milburn (*Carter Ledyard*), caused The Authentication Board to be formed – also as a not-for-profit entity.  The Authentication Board's stated purpose was to examine works attributed to Warhol and to determine their authenticity.  So powerful is the art world's reliance on The Authentication Board's opinion that, in today's art market, _no one_ can sell a Warhol if The Board questions its authenticity.  As such, The Board wields disproportionate power over the Warhol market.

10.     Yet, since The Authentication Board's formation by The Foundation under the direction of Carter Ledyard, its composition has been controversial.  The first two members were Fremont and Georg Frei, two of the world's largest Warhol dealers, who had obvious conflicts of interest.  After the ensuing uproar, they were replaced by a series of obscure figures in the art world, many of who are employed by The Foundation itself (*i.e.*, an entity that owns more than $500 million in Warhol artwork).  The Board's practices contrast sharply with those of authentication committees of other prestigious artists, which are populated by well-qualified and well-known independent experts.

11.     The Foundation and The Authentication Board, two of the main players in this conspiracy, are not your average non-profit entities.  Rather, they provide a façade of non-profit

4

corporate credibility that obscures a deeply corrupt enterprise that enables Defendants to reap financial and reputational benefit from Warhol's art and legacy.

12.     One of the principal tools upon which Defendants rely to further their conspiracy is a non-negotiable submission agreement that anyone who wants to sell a Warhol is forced to sign (the *Submission Agreement*).  The Submission Agreement contains a sweeping (and, as described below, unenforceable) indemnity clause that purports to protect not just The Authentication Board and The Foundation, but anyone who has ever acted in any capacity for The Foundation or The Estate, from any and all liability associated with The Board's rulings (including Defendant Fremont).

13.     Equally problematic, the agreement gives The Authentication Board the complete discretion to *reverse* its opinion at any time and for no apparent reason – even after it has defaced a painting by physically stamping it ***DENIED*** – which is The Board's equivalent of a scarlet letter.  Because no auction house, dealer or collector will purchase a Warhol without The Authentication Board's stamp of approval, owners of Warhol works have no choice but to sign the Submission Agreement and give The Authentication Board a perpetual veto right over its authenticity.  In short, the Submission Agreement wrongfully forces owners to forfeit all rights while reserving any and all discretion for The Authentication Board.

14.     This means that anyone who has signed the Submission Agreement and had a work "authenticated" risks a revocation at any time, for any reason.  This risk exists irrespective of any prior judgment of authenticity or listing in a Warhol catalogue raisonné -- an authoritative listing of all authentic artwork by Warhol.  Even then, buyers may find themselves the target of a coordinated campaign by some of the world's most powerful galleries and dealers to re-submit

their purchase to The Authentication Board, which reserves the right under the Submission Agreement to *deface* artwork it rejects with a physical stamp of ***DENIED***.

15.     The Authentication Board was ostensibly created as a not-for-profit corporation that would be independent from The Foundation that funds it.  In reality, however, The Board is completely dominated and controlled by Fremont and The Foundation, who routinely exploit The Board's purported independence to further their fraudulent and manipulative scheme and for significant personal benefit.  Some members and employees of The Authentication Board are paid large salaries by The Foundation for their complicity in the scheme.  Others are motivated to turn a blind eye by the prestige they gain from a position on such a high-profile board.

16.     The Authentication Board is utilized to remove competing Warhol artwork from the marketplace by falsely declaring it to be inauthentic, thereby raising the value of The Foundation's own holdings and enforcing a baseless vision of Warhol's legacy.  In many cases, the manufacturing of artificial scarcity even requires reversing prior judgments of authenticity by Fremont or reversing Warhol's own personal authentication, which is when The Authentication Board's purported "independence" proves especially advantageous.

17.     The Foundation's motives are similarly clear.  Since its creation, The Foundation has been dogged by charges of financial mismanagement.  These charges attracted a high-profile investigation by the New York State Attorney General during the mid-1990s.  Though The Foundation eventually settled these charges – after incurring millions in legal fees – it continues to have disproportionately high administrative costs relative to most charities.  The Foundation thus depends upon getting top dollar for the sale of works in its collection to pay for its substantial overhead, and to provide grants (as called for in Warhol's will and required by law).

6

240959_1.DOC

18.     Aside from the increase in value of its own Warhol works generated by artificial scarcity, The Foundation also benefits financially as a result of The Authentication Board's willingness to reverse prior judgments of authenticity.  When faced with the choice of buying artwork from an outside dealer or The Foundation, museums and galleries will often opt for the latter as protection against such reversals of judgment by The Authentication Board.  Fremont naturally earns a substantial commission on sales of Foundation artwork.  Museums, galleries and dealers dare not challenge this arrangement because their ability to have future pieces authenticated, as well as the value of existing Warhol inventory, is dependent on their relationship with the individuals who dominate The Foundation and The Authentication Board.

19.     The effects of this fraudulent and manipulative scheme are easily apparent.  Aside from The Authentication Board, which formally authenticates Warhol artwork, the only other arbiter of authenticity is currently The Foundation itself, which publishes the Warhol Catalogue Raisonné.  The Foundation and The Authentication Board thus exercise effective veto power over each and every sale of Warhol artwork anywhere in the world.  This veto power permits Defendants to systematically exclude Warhol artwork from the marketplace – artwork that would otherwise compete with The Foundation's own holdings in auctions and private sales.

20.     The controversial Submission Agreement, which purports to bar any and all lawsuits relating to The Authentication Board's judgments, coupled with The Board's policy of never explaining the reasons for its denials, shield The Board's determinations from scrutiny and liability.  As a result, Defendants and their co-conspirators are free to abuse the authentication process in pursuit of their naked self interest.  In fact, since its creation, The Foundation has sold well over $150 million in Warhol's artwork at artificially inflated prices, while Defendant Fremont has personally earned millions in connection with these sales.

7

21.     These substantial profits have come at the expense of innocent victims like Plaintiff, who is one in a long line of individuals injured by Defendants' fraudulent and manipulative scheme.

22.     Defendants' conduct has attracted significant media coverage, including numerous articles in newspapers and magazines, including a 2009 cover story in the NEW YORK REVIEW OF BOOKS, VANITY FAIR, TIME MAGAZINE, ARTNEWS and THE ART NEWSPAPER.

23.     Further evidence of Defendants' conspiracy was also revealed in the July-August 2007 issue of THE ART NEWSPAPER, which reported that the "secretive Andy Warhol Art Authentication Board may now accept certain Warhol prints as genuine that it has previously rejected."   (The Foundation owns thousands of such prints.)   Now that Defendants have successfully manufactured scarcity in the market for Warhol's artwork, this reversal of standards by The Board allows them to cash in by basically creating new works for buyers hungry for more and by authenticating works that were created after Warhol's death.  Those who buy directly from The Foundation, of course, need not worry about the "provenance" of their purchase.

24.     Plaintiff brings this action to recover the value and reputation of the *Mearns Painting*, which rightly is worth millions of dollars.

## PARTIES

25.     Plaintiff Susan Shaer is a citizen of the state of New Jersey and resides in Englewood, New Jersey.

26.     Defendant The Andy Warhol Foundation for the Visual Arts, Inc., is a New York corporation with its principal place of business in New York, New York.  The Foundation was incorporated as a not-for-profit charitable trust.   The Internal Revenue Service treats the Foundation as a "Private Foundation."

240959_1.DOC

27.     Defendant The Estate of Andy Warhol is located in New York, New York.  The executor of the Warhol Estate was originally Frederick Hughes.

28.     Defendant Vincent Fremont is a citizen of the State of New York and resides in New York, New York.

29.     Defendant Fremont Enterprises has its principal place of business at 1 Union Square West, New York, NY 10003.

30.     Defendant The Andy Warhol Art Authentication Board, Inc. is a New York corporation, with its principal place of business in New York, New York.  The Authentication Board was incorporated as a not-for-profit corporation.

31.     John Does 1-20 are past and present officers, directors and employees of The Foundation who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein.  Any such officers, directors and employees so named are citizens of New York State.

32.     Jane Does 1-10 are past and present members of The Authentication Board who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein.  Any such members so named are citizens of New York State.

33.     Richard Roes 1-10 are past and present agents of The Foundation and/or The Authentication Board, who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein.  Any such members so named are citizens of New York State.

34.     As further described in this Complaint, during the past 20 years, Fremont, The Foundation, The Authentication Board, John Does 1-20, Jane Does 1-10, and Richard Roes 1-10

9

(collectively, the *Warhol Conspirators*) have combined and conspired to control the market for, and defraud the public with respect to, the authenticity of artwork by the late Andy Warhol.

35.     The Warhol Conspirators have sought to influence, control, and monopolize the markets for authentication and sale of works of art attributed to Warhol in order to inflate the value of the thousands of works of art left in The Estate that were thereafter transferred to The Foundation, and to enforce a particular vision of Warhol's legacy without regard for the truth.

## FACTUAL ALLEGATIONS

### *The Hundreds of Millions of Dollars in Warhol Works Owned by The Estate*

36.     Hughes was the sole executor of The Estate until he died in 2001.  According to Warhol's will, Fremont is the alternate executor of The Estate.

37.     After certain specific bequests, Warhol's will left the remainder (and bulk) of his Estate to The Foundation, which was to be created upon his death.

38.     The Estate originally contained nearly 100,000 works of art by Warhol, including paintings, sculptures, collaborations, drawings, prints and photographs (*Estate Works*).

39.     The value of The Estate was the subject of contentious litigation in the New York County Surrogate's Court between The Estate, executor Hughes, and attorney Ed Hayes, who served as counsel for both The Estate and The Foundation simultaneously.

40.     In the aforementioned proceedings before Surrogate Preminger, The Estate argued that the value of the Estate Works was only $95 million, after applying a so-called "blockage discount," which is typically applied in the case of one-time mass sales of artwork to a single buyer (under the assumption that the value of the collection will decline over time).  Hayes, who was seeking to be awarded compensation by the court for work in connection with The Estate, argued, by contrast, that the Estate Works were worth in excess of $700 million.

10

41.     The Foundation endorsed The Estate's lower appraisal pursuant to blockage discounts – even though The Foundation's business plan called for controlled sales of the Estate Works *over time,* to maximize their value, rather than a one-time mass sale to a single purchaser at a significant loss.

42.     The Foundation endorsed the lower appraisal in order to minimize costs such as estate tax payments and annual charitable contributions, which were calculated as a percentage of the total value of The Estate.  As summarized by Hayes:

> Gillies [former President of The Foundation] and the Warhol Foundation . . . have an interest in a lowball appraisal.  As a nonprofit organization, the foundation will have to give away an average of 5 percent of the value of the estate *every year*; to do so involves an enormous amount of administrative work, and the more there is that has to be distributed, the more work will be required to give it away. In general, higher valuation would entail greater scrutiny, which Gillies and the foundation, who are busy currying favor with museums to whom they have sold paintings at a substantial discount, do not want.[2]

Ultimately, Surrogate Preminger found that the Estate Works had a fair market value of just under one-half billion dollars (*i.e.*, $489,907,625) prior to application of a blockage discount for estate tax purposes.  After applying that discount, Surrogate Preminger determined that the total fair market value of the Estate Works was *$390,979,278*.

### The Foundation's Serious Mismanagement and Crushing Financial Obligations

43.     The Foundation was incorporated on May 26, 1987, three months after Warhol's death.

44.     The Foundation received, among other things, virtually all of the nearly one-half-billion dollars of Estate Works.

---

[2] Edward Hayes, MOUTHPIECE 195 (Broadway Books 2006).

45.     Pursuant to Warhol's will, the first trustees of The Foundation were Hughes, Fremont and John Warhola (one of Warhol's brothers).

46.     Fremont and Hughes handled all sales of the Estate Works, receiving substantial commissions on each sale.  This arrangement proved highly lucrative.  In fact, although Hughes was officially paid a salary of $70,000 per year, he was nonetheless able to afford $7 million in antiques in 1990 alone.

47.     In or about October 1990, to avoid accusations of a conflict of interest, Fremont had to choose between remaining as a trustee of The Foundation and acting as a sales agent for The Foundation's paintings, drawings and sculptures.

48.     In or about October 1990, Fremont resigned as a trustee of The Foundation.

49.     As a quid pro quo for his resignation, Fremont entered into a five-year contract with The Foundation that made him the exclusive agent for all sales of The Foundation's paintings, drawings and sculptures anywhere in the world, and granting him a commission of 10% on each sale.

50.     In the mid-1990s, the New York State Attorney General launched an investigation into The Foundation's financial administration and practices.  Specifically, the NYS Attorney General investigated allegations of waste and financial mismanagement, including excessive salaries paid to The Foundation's employees, and the exorbitant 10% commission paid to Fremont for sales of Estate Works by The Foundation.  Formal charges were averted only after an intensive series of negotiations resulting in a deal whereby The Foundation agreed, among other things, to reduce Fremont's commission to six percent.  The Foundation reportedly spent millions in legal fees to establish their "innocence."

51.     As of the date of this Amended Complaint, Fremont remains the exclusive sales agent for The Foundation's Warhol paintings and wields enormous influence over the standards and practices that govern the authentication and sale of Warhol works.

52.     The Foundation has sold well in excess of $150 million in Estate Works since appointing Fremont as exclusive sales agent for paintings in December 1990.

53.     In the course of Fremont's exclusive sales agency, The Foundation has paid Fremont in excess of ***$10,000,000***.

54.     In addition, according to The Foundation's Form 990 for 2006, filed with the IRS as a tax-exempt organization, The Foundation paid Defendant Fremont Enterprises, an entity controlled by Vincent Fremont, compensation of $950,000 in calendar year 2006 alone.

55.     The Foundation has long-suffered from financial mismanagement.  As stated previously, the NYS Attorney General investigated The Foundation's administration and practices in the mid-90s with the cooperation of James McCauley, The Foundation's former controller.  In addition to reducing Fremont's sales commission, The Foundation agreed to implement the following changes (among others) in order to avoid charges: the implementation of new financial controls, including the creation of an audit committee; the hiring of a new chief financial officer; and the introduction of stricter accounting and bookkeeping procedures.  The Foundation was also required open its books to the Attorney General's office for review four times a year.

56.     The Foundation has long struggled to control its administrative costs.  As summarized by Mr. Hayes (former attorney for The Estate):

> Though it once had $25 million in its accounts, the foundation [in 1991] now has just $6 million in cash and securities. And though the foundation, under Gillies's leadership, will spend $7.2 million in administrative costs (including $170,000 worth of furniture for the foundation's offices) in the fiscal year ending in April

1994, it will give away just $1.1 million, an embarrassingly substandard amount; _similar groups routinely spend just eleven cents for every dollar they donate_.[3]

57.     In fiscal 1998, The Foundation reportedly paid out only $2.9 million in grants but had administrative costs of $5.3 million.  According to its IRS Form 990-PF for 2006, The Foundation paid out $8 million in grants and reported administrative expenses of $6 million. As indicated above, the ratio of grants to overhead for most comparable charitable non-profits is closer to ten to one.

58.     The Foundation has paid well over $10 million in legal fees to Carter Ledyard, an equal amount to Fremont in commissions, and a further substantial sum to former President Archibald Gillies in his retirement package.  These expenditures far exceed The Foundation's grants to any of the charities that it was originally created to support.

59.     The Foundation depends upon, among other things, the sale of the Estate Works to fund its substantial administrative costs (including salaries) and to pay out grants.  The Foundation's poor management and crushing financial obligations have motivated the Foundation to participate in the Warhol Conspirators' fraudulent and manipulative scheme.

60.     Particularly insidious is the way Defendants exploit even innocent museums and galleries to further their anti-competitive ends.  These entities depend on the Foundation to borrow works for shows and hope to purchase works at discount prices.  If the Foundation owns a series of multiple paintings, it will offer an anti-competitive discount to a museum or collection thereby ensuring the other works in series become even more valuable, due to prestige and scarcity.

**_Defendants' Illegal Procedures for the Authentication of Warhol Works_**

---

[3] Edward Hayes, MOUTHPIECE 200 (Broadway Books 2006) (emphasis added).

61.     During the period between Warhol's death on February 22, 1987 and December 1990, Hughes and Fremont were the only people who authenticated Warhol works on behalf of The Estate and The Foundation.

62.     When Fremont became the exclusive sales agent for The Foundation's painted and drawn Estate Works in December 1990, Fremont ceased having any official role in authenticating Warhol works, though he remains an unofficial "consultant" to The Authentication Board to this day.

63.     In or about January 1995, The Foundation caused the formation of The Authentication Board, which was incorporated on or about January 20, 1995 as a not-for-profit corporation under the laws of the State of New York.

64.     The Authentication Board rates submissions either: "A" for "the work of Andy Warhol," "B" for "not the work of Andy Warhol," or "C" for "not able at this time to form an opinion."

65.     Beyond The Board's formal process, the only other way of authenticating Warhol works is currently through The Foundation itself, which informally authenticates Warhol works by inclusion in the Warhol Catalogue Raisonné.  The Catalogue Raisonné, which is published by The Foundation, purports to be a comprehensive listing of all authentic Warhol works in existence.

66.     Though ostensibly an independent body, The Authentication Board is completely dominated and controlled by The Foundation.

67.     The Authentication Board is (for all practical purposes) funded by The Foundation, which depends upon the sale of its substantial collection of Estate Works to fund its own operations.

15

68.     The Authentication Board's offices are located in the same building where The Foundation stores a substantial portion of its collection of Estate Works.

69.     The Foundation and The Authentication Board share the same email address (*i.e.*, "__@warholfoundation.org").

70.     Many of the same people work simultaneously for both The Foundation and The Authentication Board.  For example, Claudia Defendi (chief curator, curator of prints, and co-editor Catalogue Raisonné of  Prints, Volumes 3 and 4), Sally King Nero (curator of drawings and photography for The Foundation and editor of the Catalogue Raisonné), Neil Prinz (editor of the Warhol Catalogue Raisonné, which is sponsored by The Foundation), Bibi Khan (assistant curator for The Foundation), and Vincent Fremont (exclusive sales agent for paintings) all work – or, in the case of Fremont, consult – for The Authentication Board as well.

71.     The very same outside counsel from Carter Ledyard who represented The Foundation in the valuation proceeding in Surrogate Court, recommended the formation of The Authentication Board and filed the non-profit incorporation papers on its behalf.

72.     Carter Ledyard attorney Ronald D. Spencer, who serves as the public face of The Authentication Board in media interviews, purports to represent The Board, The Foundation and apparently Vincent Fremont – all simultaneously.

73.     In or about 1995, Fremont resigned from The Authentication Board to avoid accusations of a conflict of interest, and to create the illusion of The Board's independence from The Estate and The Foundation.  Georg Frei of Thomas Ammann Fine Art also resigned from The Board around this same time to prevent accusations of a conflict of interest given his status as a major of dealer of Warhol works.

16

74.     By 1996, The Authentication Board consisted of four individuals: Neil Printz, Robert Rosenblum, Sally-King Nero and David Whitney.  None of these individuals possessed expertise in the authentication of Warhol works and no such experts were even considered at the time.

75.     The Foundation bought the loyalty of The Board members.  For example, Rosenblum was paid large fees to write introductions to various Warhol catalogues and given a position at The Foundation.  Rosenblum also received a substantial discount on a Warhol self-portrait from 1986 valued at several million dollars – a purchase that would otherwise have been well-beyond his financial means.

76.     Fremont has continued to be a "consultant" to The Authentication Board and has participated in, and influenced decisions ostensibly made by, The Authentication Board.

77.     The Authentication Board modifies its rejection policies for certain favored galleries dealers on good terms with The Foundation and Fremont.

78.     The Authentication Board has authenticated works submitted by these favored dealers, while rejecting works from the same series that were submitted by other less influential dealers.

79.     For example, Rupert Jasen Smith (Warhol's printer from 1977 to 1987) made hundreds of paintings and thousands of paintings and prints *after Warhol's death*.  Fremont made a deal with Fred Dorfman, an influential gallery owner and Smith's executor, to authenticate one-third of these works in return for Dorfman handing over a third to The Foundation and destroying the other third.

80.     Another example of such selective authentication is described in a 2003 expose of The Authentication Board's activities by VANITY FAIR, entitled "Judging Andy":

240959_1.DOC

And so charges of favoritism arose, charges which one dealer outside the circle decided to put to the test. He bought a Flower painting in Italy, he says, and paid $120,000 for it – "today it would be worth $500,000" – on the condition that the board approve it. He brought it back to New York and submitted it; it was returned with a B rating. So the dealer showed the painting to a more powerful dealer in New York, one who has frequent dealings with the estate. The second dealer agreed it was real, and offered to become a half-owner of it for $60,000. The painting was then submitted under the second dealer's name.

*It came back an A*.[4]

81.     The Foundation punishes those who refuse to cooperate with the Warhol Conspirators' illegal manipulation of the market (*i.e.*, refuses to authenticate their legitimate works).

82.     For example, both the 2003 VANITY FAIR piece and a 2004 article by Kelly Devine Thomas in ART NEWS (entitled "Authenticating Andy") describe the experience of Horst Weber von Beeren, who worked extensively with the aforementioned Rupert Smith, producing thousands of prints for Warhol.  As a result of this association, von Beeren had some 300 Warhols in his possession, some of which were "unpublished" prints (*i.e.*, unique), with the remainder being "excess" prints (*i.e.*, left over from limited editions commissioned by dealers from Warhol) and paintings.

83.     In or about 1996, The Foundation's then-President Archibald Gillies offered von Beeren $100,000 for all 300 of the works.  Mr. von Beeren declined, estimating the value of his Warhol works to be $2.4 million.

84.     The Foundation made a second proposal to von Beeren, offering to split the unpublished prints with him if he would turn over all excess prints to The Foundation.  Mr. von

---

[4] Michael Shnayerson, "Judging Andy," VANITY FAIR (November 2003).

Beeren again rejected The Foundation's offer after learning that he would still have to submit his unpublished prints to The Authentication Board for approval.

85.     Mr. von Beeren subsequently submitted his works to The Authentication Board in small batches, sometimes under other dealers' names.  The 2004 ART NEWS article summarizes the results of von Beeren's submissions:

> According to letters from the board that were provided to ARTnews, between June 1999 and early 2000, the board approved five of the paintings. Eight months later, it rejected three additional canvases. At the same time, the board approved seven prints and reversed its opinion about the five paintings it had previously approved. When one of the paintings it had reversed its opinion about was exhibited at New York's Tony Shafrazi Gallery in 2001, the authentication board's attorney, Ronald Spencer, sent a letter to Shafrazi alerting him to the fact that the work had been deemed inauthentic.

86.     The Board routinely denies authentication to a certain percentage of Warhols as a matter of course, particularly when one owner submits several paintings from the same series. As described in the 2003 VANITY FAIR article:

> "I bought 14 Warhol's from a major wholesaler," recounts one dealer. "These were 70s silkscreens. I bought and paid for them without written agreement because the works were not only purchased from the Andy Warhol estate but stamped with the Andy Warhol stamp – a circle - and with serial numbers from the estate. I submitted five to the authentication board. Four of the five got an A. But the fifth got a B. Now what do I do about the other nine?"

87.     The Foundation and The Board follow a related policy of purposefully excluding a certain number of works from the Catalogue Raisonné to increase scarcity.  For example, Warhol himself states in the original Catalogue Raisonné, which was published in 1970, that some 900 "Flower" paintings were created.  By contrast, The Board and The Foundation's version of the Catalogue Raisonné inexplicably recognizes only **_half_** that number.

88.     The Authentication Board has no written standard of what constitutes authentic Warhol artwork.  Rather, The Authentication Board has applied various ad hoc definitions for

authenticity.  The only feature common to these shifting – and often conflicting – criteria is that the interests of Defendants or their co-conspirators are always somehow served.

89.     Recently, for example, in or about March 2007, The Board reversed its prior policy of categorically rejecting all unsigned and unnumbered trial prints.   The Board implemented this change because of The Foundation's desire (as well as certain favored galleries and dealers) to sell such unsigned and unnumbered trial prints from their own collections.  To prevent this influx of Warhol works from disrupting the market, however, The Authentication Board has adopted a policy of limiting submissions to 300 prints at a time.

90.     The Board has further adopted a policy that submissions must be made pursuant to reservations, with The Foundation's favored galleries and dealers receiving first priority.  In this way, Defendants and their co-conspirators ensure that their own unsigned and unnumbered trial prints are the only ones that can be sold.

### *Defendants' Creation and Use of The Submission Agreement To Further Their Scheme*

91.     Some time prior to 1990, The Estate implemented a policy requiring persons seeking authentication of works attributed to Warhol to sign the Submission Agreement, which attempts to limit   The Estate's liability for its opinions.   Over the years, the Submission Agreement has been used by Defendants to hide a multitude of sins.

92.     The Submission Agreement was initially created in response to a fiasco surrounding the authentication of a painting submitted by Robert Miller, a New York art-dealer who had substantial business dealings with The Foundation and The Estate.

93.     In the summer of 1989, Miller called upon Hughes to authenticate a Superman collage – purportedly created by Warhol – that was one of 15 works (the *Superman Works*) being offered by a seller for $175,000.

94.     Hughes authenticated the 15 *Superman Works* in *exchange* for one of them. However, Miller subsequently discovered that they were fakes and sought reimbursement from The Estate.  The Estate and The Foundation rejected Miller's request.

95.     Miller threatened legal action against The Estate and The Foundation, but opted ultimately not to sue so as to preserve his substantial business relationship with both.

96.     Shortly thereafter, Miller's gallery was awarded a huge showing of Warhol photographs from The Foundation's collection.

97.     Since the time of The Authentication Board's formation in 1995, it has continued The Estate's policy of requiring all persons submitting works for authentication to sign the Submission Agreement, the terms of which are non-negotiable.   A copy of the Submission Agreement (as used in 2001) is annexed hereto as Exhibit B.

98.     The Submission Agreement attached as Exhibit B is substantially similar to the form utilized by The Authentication Board at all times since The Board's creation.

99.     The Submission Agreement contains the following coercive indemnity clause (the *In Terrorem Clause*):

> By signing this letter Owner:
>
> (iii)     hereby indemnifies the Authentication Board, the Foundation, the Estate of Andy Warhol (the "Estate"), and all members of and officers, directors, agents, representatives, employees and others at any time acting for the Authentication Board, the Foundation or the Estate (collectively, the "Indemnitees"), and agrees to defend and hold each Indemnitee, based upon any claim or liability asserted (a) by Owner or by any person or entity acquiring the Work, or any interest in the Work from Owner (a "Buyer") or any person or entity from whom Owner or any predecessor in interest acquired the Work which is based directly or indirectly on the legend or endorsement. If any, affixed to the Work, or on any letter herein referred to, or any other action by, the Authentication Board or any other Indemnitee in connection herewith, including without limitation any claim that the opinion expressed therein is not correct, or (b) by any other person to whom Owner or the Buyer has made any statement or representation

> respecting the authenticity of the Work or any action of the Authentication Board or any other Indemnitee in connection therewith, and hereby agrees to pay or reimburse each Indemnitee for all costs and expenses incurred by the Indemnitee in connection with any such asserted claim or liability, including without limitation the fees and expenses of legal counsel.

100.    The Warhol Conspirators use this sweeping In Terrorem Clause in an attempt to insulate them from liability arising from their misconduct.  In fact, the Clause purports to protect not just The Authentication Board and its members and employees, but also The Foundation, The Estate, and "all members of and officers, directors, agents, representatives, employees and others at any time acting for . . . the Foundation or the Estate."

101.    To further conceal Defendants' conspiracy, The Authentication Board adopted a policy of never explaining to owners or the public either the reasons for its rejection of works or the requisite level of involvement by Warhol for works to be deemed authentic.

102.    The Authentication Board's policy of refusing to explain the reasons for its rejections contrasts markedly to the practice of other art authentication boards, such as sculptor Alexander Calder's.

103.    To further control the Warhol market on behalf of the Warhol Conspirators, the Submission Agreement explicitly authorizes The Authentication Board to damage submissions by placing a mark on the work that indicates the Board's rejection.

104.    In practice, The Authentication Board physically stamps the word ***DENIED*** prominently in red on the back of Warhols it has unilaterally determined are not authentic (with no stated reason).

105.    To further manipulate and control the Warhol market, the Submission Agreement permits The Authentication Board to change its ruling at any time, for any reason.  In fact,

owners are obliged to notify any buyers or subsequent owner if The Authentication Board changes its mind about a work it has previously authenticated.

106.    The Submission Agreement also permits The Authentication Board to provide copies of rejection letters to third parties, "at the request of persons who the Authentication Board in its discretion determines to have an appropriate interest."

107.    Between the Submission Agreement and The Board's policy of never explaining the reasons for its decisions, Defendants have carte blanche to base authentication decisions on their own self-interest, which they have repeatedly done.

108.    The Submission Agreement was drafted by the same lawyers at Carter Ledyard who currently represent The Foundation, and who previously represented Gilles.

109.    Carter Ledyard designed and drafted certain provisions in the Submission Agreement in an attempt to insulate The Estate from litigation resulting from its authenticity rulings.

### The Enforcers of Defendants' Conspiracy

110.    The Warhol Conspirators include many enforcers, most notably Vincent Fremont, who routinely leverages his power as the exclusive agent for The Foundation's substantial collection of paintings to exert control over the market for Warhol works.  This influence brings The Foundation business and raises the prices of its own works.

111.    Aside from Fremont, Defendants also enforce their control over the market for Warhol works through a select group of powerful galleries and dealers who enjoy a special relationship with Fremont, The Foundation and The Authentication Board.

112.    These elite galleries and dealers enjoy the privilege of buying Warhol works directly from The Foundation at a substantial discount, with Fremont acting as the sales agent.

240959_1.DOC

Buyers agree, in return, not to sell the artwork for two years.   After this non-competition agreement expires, the works may be resold at a large profit without any fear that The Board will challenge their authenticity.

113.    Defendants are able to manipulate the supply of Warhol works in the market to their financial advantage by carefully timing these transactions with favored galleries and dealers.

114.    As described by Richard Polsky in his book *I Bought Andy Warhol*, these favored galleries and dealers blackball those who break the non-competition agreement by selling within two years of purchase.

115.    Defendants further enforce their power to compel formal and informal authentication of Warhol works, through (among other things) the efforts of John Does 1-20, Jane Does 1-10 and Richard Roes 1-10, who patrol the art world on behalf of the Warhol Conspirators.

116.    These enforcers do not simply wait for people to submit works for authentication. Rather, they target known Warhol owners in an attempt to get them to submit works that have even been previously authenticated by Fremont and/or Hughes on behalf of The Foundation and/or The Estate.

117.    When, for example, the Warhol Conspirators learn that an auction house, gallery or dealer has a work that has not been submitted, its enforcers "recommend" by telephone, letter or in person, that the work be submitted.

118.    The Warhol Conspirators are well-aware that The Authentication Board will ostracize any auction house, gallery or dealer that does not submit a work at their request, further cementing The Board's stranglehold on formal authentication.

119.    The Warhol Conspirators will even go so far as to contact owners of competing Warhols that have previously been authenticated, attempting to lure them into submitting their works for re-authentication when denial is a foregone conclusion.  As described in the above-cited 2003 VANITY FAIR exposé:

> One well-known New York dealer recounts getting an unsolicited letter recently from the authentication board about a Warhol painting the dealer had bought in the 1980s and kept in her personal collection. The letter advised that the painting had been overlooked in the first volume of the catalogue raisonné. "However, if I wanted to resubmit, I was welcome to do that," the dealer recounts. "The next thing I knew, the painting was stamped DENIED on top of Fred Hughes authentication!

### *Defendants Have Wrongfully Denied Many Authentic Warhol Works*

120.    The *Mearns Painting* is a Warhol self-portrait and part of a series of twelve identical paintings (the *Series*) created in August 1965 at Warhol's direction, through his employee Paul Morrissey, from an acetate personally created and chosen by Warhol.

121.    Warhol, who often traded his art when he was short of cash early in his career, and Paul Morrissey, provided Richard Ekstract an acetate with Warhol's self-portrait.  Warhol and Morrissey personally authorized Ekstract to create these 12 paintings in exchange for very rare and expensive cameras, video recorders, and related equipment (e.g. expensive video tapes) that Ekstract had obtained.  Warhol subsequently used this video equipment to make several films, including the well-regarded *Outer and Inner Space* (1965).

122.    Ekstract, under the express authorization and instruction of Warhol and his employees, arranged for this series of self-portrait paintings to be created from the acetate that Warhol provided.  This method of production was typical of Warhol.

123.    As evidence of authentication, Warhol intended these paintings to be valuable consideration for his sole and exclusive use of the video equipment, including expensive video

tapes, which Ekstract estimates was then worth approximately $16,000.  In so doing, Warhol implicitly acknowledged his authorship, thereby exercising a right of paternity that was subsequently recognized in New York by statute and is currently codified as § 14.03 of the New York Arts and Cultural Affairs Law.

124.    In 1990, Plaintiff submitted her painting to The Estate, which rated it as a C (*i.e.*, "not able at this time to form an opinion").  Mearns was informed that her submission had been so rated despite The Estate's acknowledgment, by letter dated October 31, 1990, that the painting "was made from an acetate transparency created by Andy Warhol," and that The Estate had "no basis on which to doubt that the silkscreening of the work onto canvas was authorized by Andy Warhol."

125.    Fourteen years later, in 2004, Defendants contacted Mearns by letter, dated March 23, 2004, and invited her to submit the *Mearns Painting* for review.

126.    Defendants' letter made no reference of The Board's prior systematic rejection of other paintings from the same series.  Instead, it stated ambiguously that "additional information has come to the attention of the Board since the date of the Estate's opinion letter.  Therefore you may wish to submit this painting to the Board for its opinion."

127.    The true purpose of this letter was to solicit Mearns's submission to the Authentication Board so that Mearns would be forced to sign a Submission Agreement and the painting could be stamped ***DENIED***, removing it from the marketplace.

128.    Unbeknownst to Mearns, the Board had adopted a policy of systematically rejecting works from the Series as part of its campaign to enforce a self-serving vision of Warhol's legacy achieved partially through the destruction of paintings like hers that are primary evidence of Warhol's working methods

129.    Plaintiff Mearns's brother, David, contacted The Board by telephone and email in an effort to learn what "additional information" had come to The Board's attention.  Between March and April 2004, Mr. Mearns placed several calls to Sally King Nero that were neither taken nor returned.

130.    During this same period, Mr. Mearns also spoke several times with Claudia Defendi, who spoke on behalf of Ms. King Nero specifically, and The Authentication Board generally.  Initially, The Board refused to provide any clarification.

131.    Finally, by email dated April 13, 2004, Ms. King Nero admitted that doubts had been raised about whether Warhol had authorized the creation of the _Mearns Painting_ but would not explain further.

132.    Also during this same period, Mr. Mearns began researching the provenance of his sister's Warhol work.

133.    In or about April 2004, a representative of Mr. Mearns's approached Georg Frei about the possibility of authenticating the _Mearns Painting_.  Frei was initially receptive to inspecting the painting and rendering an informal opinion of its authenticity.  But Frei's willingness abruptly vanished after he spoke with The Authentication Board.

134.    By email dated April 27, 2004, Frei admitted that he "did talk with the people from the authentication board and they all recommended you should send the painting to [New York]."

135.    During this same period, Mearns and her brother learned of the rejections of other paintings from the Series as described below.  Accordingly, Ms. Mearns refused to submit the _Mearns Painting_ for fear that rejection by The Authentication Board was a foregone conclusion.

240959_1.DOC

The price of her refusal, however, is steep.  Since the painting will never be authenticated by The

Board, so long as Defendants are in charge, its market value is effectively zero.

## TREATMENT OF OTHER PAINTINGS FROM THE SERIES

136.    Other paintings from the Series have been systematically targeted for removal

from the Warhol market.

### *Double Denied*

137.    *Double Denied* is another self-portrait from the Series owned by Joe Simon-

Whelan (*Simon*).  It is currently the subject of a lawsuit pending in the Southern District of New

York.  *Simon-Whelan v. The Andy Warhol Foundation for the Visual Arts*, No. 07 Civ. 6423

(LTS).

138.    *Double Denied* was authenticated (prior to Simon's acquisition of the work) on

multiple occasions by The Foundation and The Estate – including by Hughes and Fremont

themselves – and passed through several major dealers as well as Christie's, each of whom had

carefully vetted the painting's provenance.

139.    Nevertheless, when Simon submitted *Double Denied* on December 20, 2001 in

preparation for its sale for $2 million, The Authentication Board stamped it ***DENIED*** without

any explanation.

140.    At the urging of  Fremont and The Authentication Board, Simon subsequently

spent more than a year documenting the painting's origin and history.  Yet, when Simon

submitted his painting a second time in 2003, with the substantial fruits of his research that

demonstrated Warhol's personal role in the creation and use of the Series that includes *Double*

*Denied*, The Authentication Board stamped it ***DENIED*** for a second time.

141.   In a 2004 letter, The Authentication Board wrote that: "the board knows of no independent verifiable documentation from the period in question; 1964 through to 1965, to indicate or suggest that Warhol sanctioned or authorized anyone to make the work."

142.   Simon came to realize that both submission processes were a sham.  The first was designed to remove Simon's competing Warhol from the marketplace by declaring it inauthentic. The second was to insulate The Authentication Board from any liability for its acts by actually inspecting Simon's painting – something The Board failed to do during Simon's first submission – and by forcing Simon to sign a second Submission Agreement with its sweeping (but unenforceable) legal release.

### *Bruno B*

143.   Another victim of Defendants' conspiracy is d'Offay Gallery, which owns *Bruno B*, another painting from the same Series as the *Mearns Painting*.

144.   The name of the painting refers to Bruno Bischofberger, an art dealer who worked closely with Warhol and who was Warhol's most prolific dealer for the last 25 years of his life. In 1968, Bischofberger signed a "right of first refusal" contract with Warhol that lasted until the artist's death in 1987.  Bischofberger also co-founded Interview Magazine with Warhol and commissioned many Warhol paintings, including the Mao series in 1971.

145.   In 1969, Warhol personally dedicated *Bruno B* to Bischofberger, inscribing directly on its reverse and lower edge: "*To Bruno B Andy Warhol 1969*."

146.   In 1970, Warhol, together with Dr. Rainer Crone, edited and published his first catalogue raisonné. Warhol personally selected *Bruno B* to appear (repeated in multiples) on the dust jacket of  volume's cover. *Bruno B* also appears on the revised version published in 1972.

147.    Warhol again reaffirmed the personal importance that Warhol himself placed on the Series in July 1986 when he came to London for an exhibition of his self-portraits at the d'Offay Gallery.  Warhol signed the image of *Bruno B* on the dust jacket of the 1970 Warhol-Crone Catalogue Raisonné for the d'Offay Gallery's founder, Anthony d'Offay.  Warhol signed the 1970 Warhol-Crone Catalogue Raisonné in two places: once across the dust-cover, which reproduces *Bruno B* eight times, and again on the book's half-title.

148.    In 1996, the Foundation itself conceded the authenticity of *Bruno B* by granting the Hamburger Bahnhof Museum for Contemporary Art in Berlin to print postcards of the painting.  The back of the postcard image of Bruno B reads: "©1996 The Andy Warhol Foundation for the Visual Arts, Inc."

149.    Bischofberger later sold *Bruno B* to Heiner Bastian, a Berlin-based Warhol dealer, who, in turn, sold the painting to Sammlung Marx where it was included in a two-volume catalogue of the Marx Collection published by Schirmer/Mosel in 1996. In March 1999, the d'Offay Gallery acquired the painting from Heiner Bastien for $230,000 and, in June of that same year, sold the painting.

150.    In October 2002, Authentication Board Member and executive editor of the Warhol Catalogue Raisonné project Sally King-Nero contacted d'Offay with an urgent request to locate *Bruno B* for inclusion in the Foundation's then upcoming Volume II of the Andy Warhol Catalogue Raisonné; Paintings and Sculptures, 1964-1969.

151.    King-Nero personally traveled to San Francisco where she inspected the painting on November 6, 2002. On November 26, 2002, the Schwabs were advised that *Bruno B* would not be included in the Catalogue Raisonné at that time.  King-Nero declined to disclose the reasons for excluding *Bruno B*, which was featured on the cover of the original 1970 Warhol-

Crone Catalogue Raisonné, from this newer edition sponsored by the Foundation.  She did, however, urge the buyer to submit _Bruno B_ to the Authentication Board.

152.    The buyer signed a Submission Agreement and submitted _Bruno B_. By letter dated May 21, 2003, the Authentication Board stated: "It is the opinion of the Authentication Board that said work is not the work of Andy Warhol, but that said work was signed, dedicated and dated by him."

153.    After this shocking denial, the d'Offay Gallery collected additional evidence of _Bruno B_'s authenticity and the painting was submitted for a second time in or around June 2005. Once again, the Board rejected the painting, despite again acknowledging Warhol's personal dedication.. The d'Offay Gallery was forced to repurchase _Bruno B_ from the buyer.

## VENUE AND JURISDICTION

154.    Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b).

155.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because Plaintiff's antitrust claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

156.    This Court also has subject matter jurisdiction over this action because Plaintiff's Lanham Act claims arise under 15 U.S.C. § 1125(a).

157.    Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under state law.

31

## CAUSES OF ACTION

## COUNT ONE

## Violation of § 1 of the Sherman Act and New York Donnelly Act

158.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 157, as if fully set forth herein.

### The Relevant Market

159.     The relevant market being unlawfully dominated and unreasonably restrained by the activities of Defendants and their alleged co-conspirators is the offering and sale, at auction or otherwise, of Warhol artwork worldwide.

160.     The market for Warhols is actually a subset of the broader global market for modern and contemporary art, which includes approximately 500 artists, including Warhol, Pollock, Picasso, Miro and Rothko.  Each of these individual artists comprises his or her own distinct submarket within the general global market for modern and contemporary art.

161.     This limitation of the relevant submarket specifically to Warhol artwork finds support in the following facts, among others:

a.      Warhols are typically included in the category of "modern and contemporary artists" in auctions, museum showings, dealer and gallery advertising and sales literature, and newspaper and magazine articles;

b.      Warhols are advertised for sale, whether privately or at auction, by specific reference to the name Andy Warhol, rather than by generic reference to "modern and contemporary art";

c.      Showings and exhibitions often feature multiple Warhols to the exclusion of all other modern and contemporary artists;

d.      Expertise is defined not only in terms of the overall category of modern and contemporary artists, but also for each specific artist.  Thus, an expert in Warhols may know substantially less about other artists in the category, such as Rothko, Pollock and Chagall.  Similarly, an expert in modern and contemporary art generally, may lack expertise in the specific subcategory of Warhols;

240959_1.DOC

e.      Artists themselves are conscious of, and often influenced by, the style represented by specific artists, as opposed to the styles of modern and contemporary artists generally;

f.      Prospective buyers and sellers estimate the value of Warhols primarily by reference to other Warhols, as opposed to the hundreds of other artists included in the general category of modern and contemporary art; and

g.      Warhols are not interchangeable with works by other modern and contemporary artists because major art purchases are motivated by highly subjective tastes, indicating a lack of cross-elasticity of demand.

162.    The value of modern and contemporary art generally, and Warhols specifically, regularly ranges into the millions of dollars (or more) because the supply of artwork from a given deceased artist is fixed, prospective buyers of a given work are brought together in one room at one time for the auction, and bidders can be numerous with substantial funds to bid.

163.    Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either personally or by proxy, to bid at the auction of a specific work of art.

164.    Although the market for artwork is distinct from the market for its authentication, the two are nonetheless closely and inextricably linked.  This is because the persons who bid for and buy modern and contemporary art, whether privately or at auctions, are typically unable to ascertain by themselves the authenticity of a work they wish to buy.  Bidders and buyers thus rely heavily upon the opinion of one or more experts to guide their decisions.

165.    Institutions such as museums, galleries and auction houses routinely arrange for inspections and opinions from art experts before offering a work of art for sale, particularly if the work is newly discovered and not previously recognized as a work by the artist whose name or style appears on the painting.

166.    By reason of these opinions, vast sums of money (again, in the millions of dollars or more) are paid for works of art for which an acknowledged expert renders a convincing opinion of authenticity or probable authenticity.

167.    The persons buying such art are, in fact, buying not just the opinion and reasoning behind it, but the credentials and expertise of the authenticating expert(s), as well.

168.    Any unreasonable limitation on the use of qualified experts to inspect, employ their expertise, and render their reasoned opinions on the authenticity of major works of art, would significantly affect the market for such paintings by denying valuable information that the buying and investing public depends upon when determining whether to buy, and how much to pay, for a given work of art.

**Trade and Commerce**

169.    Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States generally, and elsewhere, and have tended to create, and actually created, a monopoly in the line of interstate commerce within such geographic areas.

170.    Plaintiff has been injured in her business and property by reason of the performance of those acts in violation of the antitrust laws.

**Claims Alleged**

171.    Beginning in or about 1987, and continuing up to the date of this Second Amended Complaint, the Warhol Conspirators have restrained trade, monopolized and attempted to monopolize said trade and commerce in the offering and sale of Warhols in New York, the United States generally, and the rest of the world, in violation of §§ 1 and 2 of the Sherman Act

(15 U.S.C. §§ 1 and 2).  These violations are continuing and will continue unless the relief prayed for herein is granted.

172.    Pursuant to, and in furtherance of, the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, Defendants have sought to prevent various Warhols from being offered and sold, at auction or otherwise, by among other things:

    a.    Maintaining an Authentication Board that supposedly investigates and renders an unbiased opinion on the origin of the artwork brought before The Board for authentication, when in reality The Board neither investigates nor renders an opinion based on its findings;

    b.    Requiring a favorable opinion of authenticity from The Board before permitting artwork to be offered or sold as a Warhol, whether at auction or otherwise;

    c.    Requiring the owner of a Warhol to accept The Board's determination or denial of authenticity through imposition of a Submission Agreement and an In Terrorem Clause that, among other things, permits The Board to physically damage works with a permanent mark displaying The Board's determination, and that purportedly waives any legal claims arising out of The Board's opinions or conduct;

    d.    Targeting known Warhol owners in an attempt to get them to submit their works for authentication even when those works have been previously authenticated by Fremont and/or Hughes on behalf of The Foundation and/or The Estate;

    e.    Using various ruses to convince owners to submit (or resubmit) their paintings for authentication when denial is a foregone conclusion, thereby removing Warhols from the market;

    f.    Employing different standards for the inspection and authentication of paintings owned by Defendants and their co-conspirators than those of Plaintiff and others similarly situated; and

    g.    Denying the authenticity of Warhol artwork for the sham reason that Warhol did not personally participate in its creation.

35

**Effects**

173.    The foregoing combination of conspiracy and violations have had the following effects, among others:

> a.    Competition for the purchase and sale of Warhols has been substantially lessened;
>
> b.    Competition for the authentication of Warhols has been eliminated;
>
> c.    Owners of authentic Warhols will not submit their work to The Authentication Board for fear of an unlawful denial;
>
> d.    Auction and other prices for Warhols have been maintained at arbitrary, non-competitive levels for paintings authenticated by Defendants – and at no significant value whatsoever for paintings not authenticated by Defendants;
>
> e.    Plaintiff and other investors, museums, art owners and owners of authentic Warhol artwork all have been denied the benefits of a competitive market for Warhols and other works of modern and contemporary by deceased famous artists; and
>
> f.    Hundreds of millions of dollars in interstate transactions and commerce relating to the offering and sale of Warhols have been restrained.

**Injury to Plaintiff**

174.    As a direct and foreseeable result of the above-mentioned violations of the antitrust laws, Defendants have excluded the _Mearns Painting_ and countless other legitimate Warhols from the marketplace, completely destroying their investment value.  Also, as a direct and foreseeable result of the above-mentioned violations of the antitrust laws, Defendants have insulated themselves from liability through systematic use of a sweeping legal waiver that deters even meritorious claims.

**Irreparable Injury and Injunctive Relief**

175.    If the Court finds that Plaintiff has not established the market value of the _Mearns Painting_ due to lack of access to the market for Warhol works, Plaintiff alternatively alleges

irreparable injury by reason of Defendants' activities and seeks preliminary and permanent injunctions prohibiting Defendants and those acting in concert with them from:

    a.    Using The Authentication Board as a purportedly independent, unbiased, truth-seeking group that endeavors to provide an honest expert opinion concerning the authenticity of Warhol works submitted to The Board for authentication.

    b.    Funding The Authentication Board, whether directly or indirectly.

    c.    Failing to provide a written opinion for all submissions of works for authentication, setting forth the reasons in reasonable detail why a particular Warhol work is deemed authentic or inauthentic, or why The Authentication Board declines to make such a determination.

    d.    Denying the authenticity of Warhol artwork on the basis that Warhol did not personally participate in its creation.

    e.    Forcing parties to sign Submission Agreements as a precondition for authentication.

## COUNT TWO

## Violation of § 2 of the Sherman Act

176.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 175, as if fully set forth herein.

177.    The relevant market is defined above in paragraphs 159 through 168, relating to the offering and sale of Warhol works in New York, the United States generally, and anywhere else in the world that Warhol works are bought and sold.

178.    Defendants possess the power to arbitrarily exclude the offering and sale of Warhol works from said market.  All of the Warhol works offered for sale anywhere in the world, whether privately or by auction, must either be listed in the Warhol Catalogue Raisonné or have a letter or opinion of authenticity from The Authentication Board before any sale, by auction or otherwise, can take place.  Thus, as for any specific Warhol work, Defendants have total domination of the market to prohibit such painting from being offered and sold either at

auction or privately in New York specifically, the United States generally, and anywhere else in the world that art is bought or sold.

179.    The reason for Defendants' overt activities as alleged was to restrain competition unreasonably, to maintain their unlawful market domination, and, alternatively, to monopolize the market for buying and selling Warhol works.  Indeed, even if Defendants have not yet attained monopoly power, their success in doing so is probable.  This is because Defendants are able to leverage their existing total control over the authentication process into monopoly power in the market for buying and selling Warhol works.

180.    Defendants' activities affect many tens or hundreds of millions of dollars in interstate transactions and commerce.

181.    This power to exclude persons from the relevant market has been, and continues to be, exercised by Defendants through their combination and conspiracy.

182.    The activities of Defendants constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2 and the New York Donnelly Act, § 340 of the New York General Business Law.

183.    By reason of these activities by Defendants, Plaintiff is unable to sell the _Mearns Painting_ in the relevant market and has suffered damages of $2 million or more, an amount Plaintiff will prove at trial.

## COUNT THREE

### Unjust Enrichment

184.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 183 as if fully set forth herein.

185.    Defendants have knowingly benefited from their illegal contract, combination or conspiracy, which caused countless buyers to pay artificially high and non-competitive prices for their Warhol works.

186.    Equity and good conscience dictate that Defendants should retain no part of the sums unjustly seized as a result of their illegal contract, combination or conspiracy.

187.    As a result of this conduct, Plaintiff has suffered damages in an amount that will be proved at trial.

WHEREFORE, Plaintiff requests for relief and judgment as follows:

a.    Decreeing that:

(i)    each of the Defendants violated Section 1 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to restrain trade;

(ii)    each of the Defendants violated Section 2 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to monopolize, and actually monopolizing, the relevant markets;

b.    Awarding actual damages to Plaintiff in an amount to be trebled pursuant to 15 U.S.C. § 15(a);

c.    Granting restitution to Plaintiff in an amount equivalent to Defendants' unjust enrichment as a result of their conspiracy;

d.    Awarding appropriate punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct;

e.    Awarding attorneys' fees for Plaintiff;

f.    Awarding pre- and post-judgment interest to Plaintiff;

g.    Awarding Plaintiff's costs incurred litigating this suit;

h.    Enjoining Defendants, individually and collectively, and all persons working with them from:

(i)    participating in the actual or purported authentication, or the

offering or sale by auction or otherwise of Warhol works while any Defendants who participate in the authentication process, whether formally or informally, has any financial interesting any Warhol works.

(ii)     refusing to permit the market for Warhol works to have access to or consider opinions on authenticity (together with the reasons offered in support of them) rendered by any art experts not approved by Defendants to authenticate Warhol works; and

(iii)    further antitrust violations of the kind alleged in this complaint.

i.     Awarding Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all claims for relief that may be tried before a jury.

Dated: New York, New York
       January 15, 2010

Respectfully submitted,

**REDNISS LLC**

By: _____
Seth Redniss (SR-7988)
49 West 37th Street, 15th Floor
New York, New York 10018
212.334.9200

Lee A. Weiss (LW-1130)
Brian C. Kerr (BK-6074)
Andrew Wilmar
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, New York 10018
212.354.4901

*Counsel for Plaintiff*

40

240959_1.DOC