UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOE SIMON-WHELAN,

                    Plaintiff,                    Case No.  07 Civ  6423 (LTS) (AJP)


          -against-

THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS, INC., et al.,

                    Defendants.

          -and-

SUSAN SHAER,                                      Case No.  10 Civ  373 (LTS) (AJP)

                    Plaintiff,

          -against-

THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS, INC., et al.,

                    Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE EXPERT REPORTS

Plaintiffs, by and through their undersigned counsel, respectfully submit this

memorandum in opposition to defendants' August 16, 2010 letter requesting that the Court strike

the expert reports prepared by Dr. Dietmar Elger (attached as Exhibit A) and Sarah Whitfield

(attached as Exhibit B), and seeking additional sanctions.

## INTRODUCTION

Plaintiffs have designated Dr. Elger and Ms. Whitfield as their experts in this case.  Ms.

Whitfield and Dr. Elger are highly respected art scholars who have each opined that defendants'

practices with respect to the authentication of Warhol works are inconsistent with accepted industry standards (both as to the art market in general, and specifically as it relates to the two works at issue in this case). As set forth below, Dr. Elger's and Ms. Whitfield's reports (which set forth all of their opinions and the data considered by each of them) satisfy the requirements of Rule 26 and should not be stricken.

For example, Dr. Elger clearly states in his report that he is giving an opinion on the "authenticity of [the two works owned by plaintiffs Joe Simon-Whelan and Susan Shaer] that are thought to be by Andy Warhol." Elger Rep. at 1. Dr. Elger then explains that the basis for his opinion is his "significant experience with Andy Warhol as an artist (and his self-portraits in particular)" (*id.*), as well as his consideration of certain documents (including an exchange of correspondence between the President of the Warhol Foundation, Joel Wachs, and one of plaintiffs' witnesses, Dr. Rainer Crone, concerning key facts at issue in this case). *Id.* at 2.

Ms. Whitfield has similarly explained in her report the opinions she is giving in this case. Specifically, she states her opinion that: (1) unlike defendants' authentication procedures, "works of art should never be mutilated or marked in an irreversible manner as part of the authentication process"; and (2) unlike the Warhol Foundation and the Warhol Authentication Board, "authenticating bodies (including authentication committees and catalogue raisonnes) should be independent from the commercial art market (including dealers and auction houses) on every level." Whitfield Rep. at 3. Ms. Whitfield further explains that the basis for her opinions is her "experience of sitting on authentication committees and working on catalogue raisonnés," as well as her review of a number of documents in the case (including pleadings, deposition transcripts, documents produced in discovery. *Id.* at 2-3.

Rather than conducting expert discovery, Defendants have taken the unusual step of seeking to dismiss plaintiffs' case based upon their view that the reports are incomplete. However, Dr. Elger's and Ms. Whitfield's reports are more than sufficient to provide defendants with ample notice of the expert testimony that will be proffered by plaintiffs at trial. Moreover, even if defendants are correct, and they have received incomplete initial expert designations, they should not also receive the ultimate sanction of dismissal, or a sanction equivalent to that because defendants have not been substantially prejudiced. In the absence of substantial prejudice, courts typically fashion remedies to alleviate any purported prejudice. This was precisely what occurred in *Johnson v. Sacramento County*, No. CIV-S-06-0169 DFL GGH, 2007 WL 127799, **1, 4 (E.D. Cal. Jan. 12, 2007), a case where, unlike here, a party provided very incomplete expert reports by the deadline for designations and then filed supplemental reports after the deadline. As aptly explained by that court:

> This case involves the unfortunate, but negligent, designation of an expert insofar as very incomplete opinions were presented in the expert's initial report. Defendants seek to gut plaintiff's case on account of plaintiff's counsel's failure in this regard. Thus, the usual tension between enforcing respect for scheduling orders with resolving cases on their merits is present. While defendants' counsel is correct that violation of scheduling orders should not simply be ignored, the penalty should also fit the crime; a party receiving a late or incomplete designation should not receive the ultimate sanction of dismissal, or a sanction tantamount to such, unless the receiving party is substantially prejudiced.

> Defendants cannot read the "harmless" or "lesser sanctions" exceptions out of the enforcement rule, Rule 37(c)(1), especially where the failure to disclose is not accompanied by gamesmanship, bad faith or deliberate disobedience of a court order. Prejudice is a component of any sanctions analysis as is the need to explore the existence of lesser, yet still effective sanctions. . . . The court fashions a less drastic remedy as follows. As discussed at hearing, depositions of the experts will take place. Plaintiff is to proffer his belatedly designated expert first. Defendants will not have to pay this expert for his time at deposition. Also, defendants' expert(s) testifying in the same area as plaintiff's belated expert may express opinions out-side of his/her/their current report.

*Id.*

As set forth below, there is no prejudice here. Dispositive motions have not yet been filed. In addition, defendants had no problem designating their own experts on the same issues covered by Dr. Elger and Ms. Whitfield. Moreover, defendants will have an opportunity to depose plaintiffs' experts before trial (which is not scheduled to take place until sometime after January 2011).

Further, the "purpose of an expert report is to eliminate unfair surprise to the opposing party." *In Re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009). Defendants cannot claim any surprise at the expert testimony that Dr. Elger and Ms. Whitfield will offer at trial. Indeed, for years, defendants and their attorneys have been quoted extensively in the media stating that they believe the paintings in the series are not authentic and that defendants' authentication bodies are completely independent and have at all times acted appropriately (which are the precise contentions that Dr. Elger and Ms. Whitfield challenge). As defendants have now testified to those positions in this case during discovery, there can be no doubt that they are amply prepared for expert testimony on the issue.

Accordingly, the Court should deny defendants' motion to strike the expert reports.

## RELEVANT LEGAL STANDARD

FED. R. EVID. 702 allows a "witness qualified by knowledge, skill, experience, training or education" to testify if such specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. In the Second Circuit, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005). The "assumption the court starts with is that a well qualified expert's testimony is admissible." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d

230, 282 (E.D.N.Y. 2007). Defendants do not, and cannot, challenge the qualifications of either Dr. Elger or Ms. Whitfield.

Rule 26 of the Federal Rules of Civil Procedure requires an expert to "submit an expert report that contains all of the expert's opinions, the data considered by the expert, any exhibits to be used to summarize the opinions, the expert's qualifications, the expert's compensation for the testimony and a listing of expert's involvement in related cases." *Wechsler v. Hunt Health Systems, Ltd.*, 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003). Under Rule 37, a "court may refuse to allow testimony on a matter that a party failed to include in an expert report 'unless the failure was substantially justified or is harmless.' Although complete disclosure is strongly encouraged, the court retains broad discretion to determine whether a report is substantially complete, whether the opposing party was harmed by an omission, and whether any sanction is warranted." *In Re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 477 (S.D.N.Y. 2009) (quoting FED. R. CIV. P. 37(c)(1)).

The "purpose of an expert report is to eliminate unfair surprise to the opposing party." *Id.*, 643 F. Supp. 2d at 482 (internal citation omitted). "Ideally, an expert report would contain every fact, conclusion and detail of the planned testimony. However '[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.'" *Id.* at 482 (internal citation omitted). The issue, therefore, is whether the expert report is "substantially complete and any omissions are either justified or harmless." *Id.*

Finally, it is important to note that exclusion of expert testimony is a drastic remedy. *See Wechsler v. Hunt Health Systems, Ltd.*, 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003). "Precluding testimony of an expert, even when there has not been strict compliance with Rule 26, 'may at

times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants.'" *Id.* (quoting *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 277 (S.D.N.Y 1998)).

**ARGUMENT**

## I.   THE ELGER REPORT IS SUFFICIENT UNDER RULE 26

Dr. Dietmar Elger is a distinguished art historian and a specialist in Andy Warhol self-portraits.  As set forth in his report, Dr. Elger curated the first exhibition on "Andy Warhol, Self Portraits" that was shown in renowned public museums in Switzerland, Germany and Scotland. Elger Rep. at 1-2.  In connection with that exhibition, he published an extensive essay on Warhol's self-portraits in the accompanying catalog and examined numerous Warhol self-portraits.  *Id.*  Dr. Elger has also served as the Editor for the Catalogues Raisonné of Gerhard Richter and Felix Gonzalez-Torres.  *Id.* at 1.

Dr. Elger will provide his opinion as to the authenticity of plaintiffs' paintings.  The opinions set forth in Dr. Elger's report are clear and, as with Ms. Whitfield, based upon his years of experience in the art world, including having recently curated an exhibition of Warhol self-portraits.  *Id.* at 1. This is a perfectly acceptable basis for an expert witness's opinions.  *See Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, No. 05 Civ. 9016 (SAS), 2010 WL 882893, *4 (S.D.N.Y. Mar. 10, 2010) (expert witness may support his opinions by reference to experience); *see also Emig v. Electrolux Home Prods., Inc.*, No. 06-CV-4791 (KMK), 2008 WL 4200988, *5 (S.D.N.Y. Sept. 11, 2008) ("[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license.  Indeed, it is not uncommon for a person to qualify as an expert based on his or her experience alone.").

Moreover, Dr. Elger has identified specific communications on which he has relied in forming his opinions.  For example, Dr. Elger explains that he has considered a key exchange of

communications between the defendants (specifically, Joel Wachs, President of the Warhol Foundation) and Dr. Rainer Crone (an art scholar who has given testimony in this litigation concerning, among other things, the fact that Andy Warhol himself chose the self-portrait series at issue in this case to appear on the cover his first catalogue raisonné).  Elger Rep. at 2.  Dr. Elger also explains that he previously discussed authentication issues with Robert Rosenblum, an art scholar who was one of the original members of the Warhol Authentication Board.  *Id.*  This satisfies Rule 26, as it sets forth the basis of, and the information consider by Dr. Elger in formulating, his opinions.  *See* Fed. R. Civ. P. 26(A)(2)(b)(i) and (ii).

Furthermore, Dr. Elger's opinions are based on facts that defendants cannot contest.  For example, Dr. Elger relies upon the uncontested facts that: both of plaintiffs' paintings belong to the same series of paintings; one painting in this series was signed and dedicated by Andy Warhol (but stamped "denied" by defendants); Mr. Simon-Whelan's painting was authenticated by the Estate of Andy Warhol; and the lack of a signature (such as with Ms. Shaer's painting) by the artist does not indicate that her work is inauthentic. Elger Rep. at 3.

Based on Dr. Elger's expertise with Warhol self-portraits and the lack of any material dispute concerning the creation of plaintiffs' paintings, his testimony would assist the trier of fact in understanding (among other things) that Mr. Warhol would not have signed a painting that was not his, let alone select such painting as the cover for a catalogue raisonné.    The Elger Report, therefore, satisfies Rule 26.

Finally, defendants do not, and cannot, argue that they will be surprised in any manner by Dr. Elger's testimony concerning the authenticity of plaintiffs' paintings.  Moreover, Dr. Elger's expressed intention of reviewing further documentation and supplementing his report does not mean that his report is not "substantially complete" – rather, it is a typical point for an expert to

make as they may learn additional facts between the time of their report and trial. *See* FED. R.

CIV. P. 26(e); *Kerns v. Board of Commissioners of Bernalillo County*, No. CIV 07-0771

JB/ACT, 2010 WL 1632732 (D.N.M. Mar. 31, 2010).

## II. <u>THE WHITFIELD REPORT IS SUFFICIENT UNDER RULE 26</u>

As set forth in her report, Ms. Whitfield is a highly regarded expert in the field of art

authentication. Her qualifications include:

- Co-author of the René Magritte Catalogue Raisonné;

- Member of the Comité Magritte (the authentication committee established by the *Fondation Magritte*);

- Member of the Board of the Arshile Gorky Foundation;

- Member of the authentication committee for the Estate of Francis Bacon; and

- Editor of the Catalogue Raisonné of William Scott, under the auspices of the William Scott Foundation.

Whitfield Rep. at 3.

As set forth in her report, Ms. Whitfield will testify as to (1) general art authentication

procedures within the contemporary art market, and (2) defendants' specific authentication

practices. *Id.* at 2. Given her substantial experience in authentication practices and her

familiarity with practices of the defendants at issue in these actions, there is little doubt that Ms.

Whitfield is qualified to offer the opinions set forth in her report and has a significant basis for

her expert testimony. Her report clearly explains that she is drawing on her experience in

reaching her conclusions, which is completely appropriate (*supra*). *See, e.g.*, Whitfield Rep. at

("my opinions will be limited to my experience of sitting on authentication committees and

working on catalogue raisonnes").

Ms. Whitfield also states that she considered a number of documents, including: (1) Mr.

Simon's amended complaint; (2) Ms. Shaer's amended complaint; (3) portions of deposition

transcripts of multiple fact witnesses; and (4) documents produced by defendants in discovery.

Whitfield Rep. at 2. If the Court concludes that Ms. Whitfield has not adequately listed the data

she considered, she should be provided the opportunity to correct the report. As the court held in

*Lewis v. PDV America, Inc.*:

> CITGO objects that Raterman's report does not explain the bases for her opinions.
> It does, although somewhat minimally. She does not, however, list the "data or
> other information considered by the witness in forming the opinion" and is
> therefore deficient. She will be given 21 days to correct this defect.

247 F.R.D. 544, 548 (N.D. Ill. 2007). *See also Ille v. American Family Mutual Ins. Co.*,

No. 03-2092 (JRT/JSM), 2005 WL 1432211 (D. Minn. May 23, 2005) (although

Magistrate Judge determined that expert report did not comply with Rule 26 because it

did not set forth the basis and reasons for the expert's opinions and conclusions, he

ordered the expert to supplement her report rather than striking the report and precluding

her from testifying); *Ayers v. State Farm Fire & Casualty*, Civil Action No.

1:06CV1261-LTS-RHW, 2007 WL 6969286 (S.D. Miss. Dec. 3, 2007) (denying motion

to strike expert designations where supplemental information can correct any

deficiencies); *Nelson v. Safeco Ins. Co. of Am.*, Civil No. 2:03-CV-574 DAK, 2005 WL

5988661 (D. Utah Jan. 21, 2005) (denying motion to strike report and expert testimony

based on failure to include in report a complete statement of the basis and reasons for

opinions).

Moreover, while defendants complain that they are unable to determine what documents

Ms. Whitfield reviewed, and that they are somehow prejudiced, the facts upon which Ms.

Whitfield relies in her report are not in dispute.[1]  Specifically, the Whitfield Report refers to defendants' practices of stamping denied artworks with red ink and the word "Denied" (something that is not disputed).  Based upon her experience, the act of defacing artwork with a stamp is inconsistent with accepted industry practice that authentication decisions should be subject to change.  Whitfield Rep. at 3-4.  In fact, defendants are the only authentication committee of which she is aware that defaces works while rendering a denied opinion.  *Id.* As she writes in her report, "[i]n the case of the Andy Warhol Art Authentication Board, Inc., the practice of physically stamping works 'denied' suggest that its authentication decisions are not open to revision."  *Id.*  Defendants cannot deny that they stamp works denied, and therefore, cannot seriously contest the sufficiency of any of Ms. Whitfield's opinions to the extent that they are based upon conceded acts and practices of defendants.

Similarly, Ms. Whitfield is qualified to testify that, "for maximum credibility, authentication procedures should ideally be independent from the market on every level." *Id.* at 4.  Based upon her experience, "the more a dealer is seen to be involved, the more the integrity of the authentication body could potentially be subject to criticism." *Id.*

Ms. Whitfield's opinions concerning defendants' practice of defacing artwork and the impropriety of dealer-influenced authentication bodies will assist the trier of fact in understanding the evidence and determining facts at issue.  This testimony is relevant not only to the antitrust claims in both Mr. Simon's and Ms. Shaer's cases, but also to Mr. Simon-Whelan's

---

[1] If the Court find prejudice based upon Ms. Whitfield's failure to specifically identify each document upon which she relied, it can provide defendants' experts with a reasonable to time to supplement their reports after Ms. Whitfield has supplemented her report to provide the information.

claims for unjust enrichment, declaratory relief, fraud and product disparagement under the
Lanham Act.

The facts upon which the Whitfield Report relies are not disputed. Defendants stamp
denied works with a red stamp and the Authentication Board has defaced every painting from
this series that it has examined since September, 1996 in the same manner. If the Whitfield
Report was limited to this opinion alone, based on her extensive experience, her testimony would
assist the trier of fact in understanding the shocking extent to which defendants' practices deviate
from standards applied by authentication committees and catalogue raisonnes that are structured
to maximize their independence. The Whitfield Report, therefore, satisfies Rule 26.[2]

---

[2] Even if the Court were to conclude that the Whitfield and Elger reports do not comply with
Rule 26, none of the cases cited by defendants support the remedy they seek. *Great White Bear,
LLC v. Mervyns, LLC*, cited extensively by defendants, recognizes that "[t]he preclusion of
evidence is, of course, itself a harsh sanction.", 2008 WL 2220662 at *6 (S.D.N.Y. May 27,
2008) (Maas, M.J.). Moreover, defendants offer no authority precluding the testimony of an
expert witnesses where, as here, there has been no opportunity to supplement allegedly deficient
reports. *See, e.g., Id.* (plaintiff "was given many opportunities to correct its report"); *Lava
Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238 at *5-6 (S.D.N.Y. Apr. 11, 2005)
(Dolinger, M.J.) (expert had prepared "various reports and supplementations" in response to
deficiencies alleged by defendant); *251 CPW Housing Ltd. v. Paragon Cable Manhattan*, 1995
WL 70675 at *1 (S.D.N.Y. Feb. 21, 1995) (Martin, J.) (plaintiffs were given numerous
extensions of discovery deadline and an opportunity to resubmit expert reports). "[T]he Second
Circuit has held that preclusion is a discretionary remedy, even if "the trial court finds that there
is no substantial justification and the failure to disclose is not harmless." *Great White Bear*, 2008
WL 2220662 at *5 (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006)).
In exercising that discretion, the trial court must weigh a number of factors, including "(1) the
party's explanation for the failure to comply with the [disclosure requirement]; (2) the
importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the
opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility
of a continuance." *Id.* (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).
Although the court in *Great White Bear* did strike certain portions of an expert report, it did so
only after analyzing each of these factors and finding that, not only was plaintiff's non-disclosure
inexcusable in light of the "many opportunities to correct its report," but also that expert

## III. **SANCTIONS ARE NOT APPROPRIATE UNDER RULE 37**

At the end of their letter, defendants move well beyond their Rule 26 objections and seek a case dismissal sanction primarily on the basis that "neither Plaintiffs nor their counsel have taken these cases, or their obligations to the Court and under the Federal Rules of Civil Procedure, seriously." In support of their request (which plaintiffs note is itself procedurally improper because there was no attempt to meet and confer), defendants dredge up a number of issues that have been previously litigated over the last several months, and resolved (sometimes in the plaintiffs' favor) without any sanctions being imposed by the Court. Thus, there is certainly no basis for dismissal of plaintiffs' case based on any alleged pattern of misconduct.[3]

---

testimony was not critical to the case since plaintiff could offer "at least some of the substance of the Report through a fact witness." 2008 WL 2220662 at *6. *See also Giladi v. Strauch*, 2001 WL 388052 (S.D.N.Y. Apr. 16, 2001) (Pitman, M.J.) (precluding expert testimony after plaintiff had been given 60 days to supplement reports, the report of one expert was just two sentences long, and the other was expressly permitted to testify as a fact witness); *Smolowitz v. Sherwin-Williams Co.*, 2008 WL 4862981 at *3-4 (E.D.N.Y. Nov. 10, 2008) (physician permitted to offer as a fact witness opinions set forth in one-page report). Here, by contrast, plaintiffs have never been given any opportunity to correct what defendants contend are defects in the expert reports. Further, the expert opinions are both critical to plaintiffs' cases and unavailable through fact witnesses. It is respectfully submitted that remedies short of preclusion are warranted should the Court find the expert reports inadequate. This Court's decision in *Ebron v. United States*, 2008 WL 4298515 (S.D.N.Y. Sept. 17, 2008), in no way supports defendants' motion to strike. Despite their extensive quotation from the opinion, defendants neglect to mention that Magistrate Judge Peck did not strike the report of the expert in that case but merely precluded him "from offering any opinion at trial beyond the opinion ... in his expert report." *Id.* at *5. That relief is a far cry from the "harsh sanction" sought by defendants here of precluding plaintiff's witnesses from testifying at all – even with respect to the opinions plainly set forth in their reports.

---

[3] *New York Bay Co., Ltd. v. State Bank of Patiala*, No. 93 Civ. 6075(WK)(AJP), 1995 WL 567357 (S.D.N.Y. Sept. 25, 1995) ("The most severe sanctions require the highest degree of fault. Put another way, the 'degree of fault which must be shown increases in proportion to the severity of the sanction.' 2 M. Silberg § 26.09 at 26-27. 'The sanction of dismissal [or default

Furthermore, as the Court is well aware, defendants have mounted a relentless and costly defense in this case (costing millions of dollars in attorney's fees alone) that resulted in a hard-fought period of discovery. Indeed, the defendants have themselves engaged in a number of improper acts, including disclosing plaintiffs' confidential information to the press, and forcing plaintiffs to spend thousands of dollars on experts just to obtain basic electronic discovery that should have been produced without any objection. Therefore, for defendants to say that plaintiffs have not taken this case seriously, or that the case has been improperly litigated, is flat wrong.

In addition, defendants repeatedly (and misleadingly) claim that Mr. Simon-Whelan admitted in his deposition that he has not taken his obligations to the Court and under the Federal Rules of Civil Procedure seriously. This is, of course, like defendants' other claims against plaintiffs and their counsel, completely false. Defendants' counsel cites 16 instances of Mr. Simon-Whelan's use of the word "seriously" in an effort to establish that sanctions should be awarded because Mr. Simon-Whelan has not taken his obligations seriously. In fact, as demonstrated below, in each instance, defendants have simply searched plaintiff's deposition for the word "seriously" and then quoted them out of context in their application:

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 76:24-25 refers to demands made by an former boyfriend of plaintiff in a year-old litigation in another country after their personal relationship dissolved, and does <u>not</u> refer to plaintiff's obligations to the Court or under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 155:17-18 refers to demands (here, a hypothetical automobile) made by the same former boyfriend and does

judgment] is a drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'") (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853-54 (2d Cir.1995)).

not refer to plaintiff's obligations to the Court and under the Federal Rules of Civil
Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 196:12-13 refers to a
  third-party's claim years ago that plaintiff was having an affair with someone in South
  Africa and does not refer to plaintiff's obligations to the Court and under the Federal
  Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 196:12-13 refers to a
  third-party's personal claims years ago against plaintiff including that was having an
  affair with someone in South Africa and does not refer to plaintiff's obligations to the
  Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 198:9 refers to a
  various unsubstantiated claims made by a third-party against plaintiff based on the same
  trip to South Africa and does not refer to plaintiff's obligations to the Court and under the
  Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 200:10-11 refers to
  the same South African issues and does not refer to plaintiff's obligations to the Court
  and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 213:24-214:4 refers
  to the same (false) South African personal accusations made against him years ago and
  does not refer to plaintiff's obligations to the Court and under the Federal Rules of Civil
  Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 214:9-10 refers to
  the identical issues as above and does not refer to plaintiff's obligations to the Court and
  under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 220:6-18 refers to
  the same (false) personal accusations (here, relating in part to financing a film project)
  made against him years ago by the same individuals in the above citations and does not
  refer to plaintiff's obligations to the Court and under the Federal Rules of Civil
  Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 230:11-12 refers to
  the same (false) personal accusations made against him years ago (which plaintiff denied)

and does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 234:20-21 refers to a work of fiction written by a third-party and does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 236:25 refers to the same (false) personal accusations made against him years ago by the same individual and does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 244:13-14 refers to a potential book project on mercenaries and does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 255:15-17 refers to the false allegations against Mr. Simon-Whelan by Horst Weber von Beeren who, after publicly supporting plaintiff for years, supplied defendants' counsel with an affidavit and then successfully avoided service by plaintiffs' counsel who were attempting to depose him on the contents of the affidavit (to establish their falsity). Plaintiffs' counsel has repeatedly attempted to locate Mr. Weber von Beeren directly and has sought to find him through defendants (at depositions) and defendants' counsel (all of whom claim to have no idea where he is). This testimony does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 266:11-13 refers to plaintiff's physical handling of artwork that he did not consider to be good and does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure;

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 267:17-19 refers to plaintiff's efforts starting in 2000 to make audiotapes (among other means of keeping records) relating to his submissions of artwork to defendants. Plaintiff testified that he "never knew this was going to go so far, so I never took any of that so seriously, it was a halfhearted thing to help my memory." This testimony does <u>not</u> refer to plaintiff's obligations to the Court and under the Federal Rules of Civil Procedure; and

- Mr. Simon-Whelan's use of the word "seriously" in his testimony at 268:16 refers to plaintiff's general and personal use of email. As defendants' know, plaintiff, an

individual, produced more than tens of thousands of pages of documents in this litigation and his testimony does <u>not</u> refer or suggest that he has not, in any manner, that he has not complied with his obligations to the Court and under the Federal Rules of Civil Procedure.

As plaintiff's deposition makes clear, if anyone has sought to avoid the merits of these cases, it is defendants and defendants' counsel who initially asked the Court for three days for Mr. Simon-Whelan's deposition and then spent many hours fishing in plaintiff's personal life in a vain effort to support defendants' reckless accusations against Mr. Simon-Whelan.

Defendants' misleading framing of this issue is itself a misrepresentation that should not be countenanced. While defendants' may be frustrated that they were unable to substantiate the panoply of false allegations that defendants' have asserted with no basis whatsoever (and to which Mr. Simon-Whelan was referring in certain of defendants' out-of-context quotes), Mr. Simon-Whelan has taken his obligations seriously and has dedicated significant time and resources to moving his case ahead expediently.

Ms. Shaer has also taken her obligations seriously, and as recently as September 1, rearranged her schedule on a day's notice to drive her Warhol painting from New Jersey to defendants' counsel's Manhattan office to accommodate the schedule of one of defendants' expert witnesses.[4]

---

[4] Notably, defendants have not offered a single case where a court dismissed an action as a sanction for allegedly incomplete expert reports. Moreover, the cases they do cite involve conduct that is in no way analogous to the conduct at issue here. *In re Tartaglione*, 2008 WL 336844 (S.D.N.Y. Feb. 5, 2008), the primary case on which defendants rely, is readily distinguishable. There, the bankruptcy court granted default judgment in one adversary proceeding, after the debtor responded to a Court Order for the production of documents by testifying that he did not have possession of the documents, even though that was patently false. *Id.* at *1-2. Thereafter, in a second adversary proceeding, the Bankruptcy Judge warned the debtor that a default judgment would be entered if he failed to respond to discovery requests, and then entered such a judgment after the debtor ignored discovery requests and two follow-up

## CONCLUSION

Based on the foregoing, defendants' motion should be denied in its entirety.

Dated: September 15, 2010
  New York, New York

**REDNISS LLC**

By: /s/ Seth Redniss
Seth Redniss
79 Fifth Avenue, 16th Floor
New York, New York 10003
212.334.9200

Lee A. Weiss
**BROWNE WOODS GEORGE LLP**
1 Liberty Plaza, Suite 2329

---

letters seeking compliance with the requests. *Id.* at *2. The purported actions set forth by defendants, even if true (as discussed above and in prior submissions to this Court, defendants have not accurately portrayed the events that transpired during discovery), do not rise anywhere near the level of willful disobedience at issue in *Tartaglione*. *See also John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 845 F.2d 1172 (2d Cir. 1988) (dismissing action after party failed to comply with three Court Orders to provide a detailed breakdown of his damages claim). Moreover, in *John B. Hull*, the Second Circuit expressly stated that "the sanction of '[d]ismissal under Fed.R.Civ.P. 37 is a drastic remedy that should be imposed only in extreme circumstances,' *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir.1986), quoting *Israel Aircraft Indus., Ltd. v. Standard Precision*, 559 F.2d 203, 208 (2d Cir.1977), usually after consideration of alternative, less drastic sanctions." make this a footnote here:  The conduct in *Lediju v. New York City Dept. of Sanitation*, 173 F.R.D. 105 (S.D.N.Y.1997), decided by this Court, was similarly extreme, and bears no relation to the issues concerning the expert reports here. There, the plaintiff's case was dismissed after he failed to submit summary judgment opposition papers for four months, and after "he was warned that failure to do so would result in dismissal for failure to obey court orders." *Id.* at 113. Moreover, during that same time period, plaintiff "willfully failed after Court Order (and after being warned of the consequences) to make himself available for a deposition or to answer interrogatories ..." *Id.* Finally, as discussed above, in *Ebron*, this Court merely held that an expert witness could not offer testimony on opinions not contained in his report. It then dismissed two causes of action, as they could not be supported without the opinions on which this Court would not let the expert testify (informed consent and malpractice). *Ebron*, 2008 WL 4298515, at *4. Here, defendants do not even attempt to explain how the striking of either of the expert reports at issue mandates dismissal of any claim. Instead, they basically preview their summary judgment motion on plaintiffs' antitrust claims. While defendants have the right to file such a motion, it is unrelated to the sanctions that they seek.

New York, New York 10006
212.354.4901

*Counsel for Plaintiffs*

# EXHIBIT A

**DR. DIETMAR ELGER**
Thomas-Muentzer-Platz 10
01307 Dresden
Germany

Re:    Simon-Whelan v. The Andy Warhol Foundation for the Visual Arts Inc., et al.
Shaer v. The Andy Warhol Foundation for the Visual Arts, Inc., et al.

## I. Introduction and Purpose

Plaintiffs have asked me to opine on the authenticity of their two self-portrait paintings thought to be by Andy Warhol. I note that at the time I am submitting this report that I have not had full access to all relevant materials that may bear on this opinion. In the event that my review of such materials results in a revised and/or expanded opinion, I preserve the right to amend this report. I do, however, have significant experience with Andy Warhol as an artist (and his self-portraits in particular) and can posit this opinion with certain key assumptions. I am not being compensated for my services.

## II. Qualifications

I studied art history at the University of Hamburg, Germany, from 1978 until 1984 when I received my doctorate degree. From 1984 to 1985, I worked for approximately 18 months as a secretary and art historian for the German artist Gerhard Richter in Cologne. From 1985 until 1988, I was a Curator for Painting and Sculpture at the Museum am Ostwall in Dortmund, and from 1989 until 2006 at the Sprengel Museum Hannover. Both museums are exclusively focused on 20th century art. Since 2006 I have served as the Director of the Gerhard Richter Archive, and the Chief Curator for Contemporary Painting at the State Art Collections in Dresden. Starting in 1982, I curated a large number of exhibitions on modern and contemporary art and artists, and I have written the accompanying catalogs as well as several books on artists and art of the 20th century.

I have edited of the catalogue raisonné of the artists Gerhard Richter (published in 1986), and Felix Gonzalez-Torres (published in 1997). Currently, I am working on a new catalogue raisonné of the work of Gerhard Richter, to be published from 2011 on in 5 volumes. All three catalogue raisonné-projects involve questions of authenticity, authorized works, and (with Felix Gonzalez-Torres) the question of handmade works.

I curated the first exhibition on "Andy Warhol, Self-Portraits", that was shown in 2004/2005 in renowned public museums in St. Gallen (Switzerland), Hannover (Germany), and Edinburgh (Scotland), and wrote an extensive essay on Warhol's self-

portraits for the accompanying catalog. In the course of that exhibition I closely examined numerous self-portraits by Andy Warhol in the original. As an art historian I have a longstanding interest in, and close familiarity with the work of the artist since more than 30 years. I have followed this specific case in the media since I read about it in an article in Vanity Fair in November 2003, and have also discussed it and the general question of authentication of Warhol's works with Prof. Robert Rosenblum in 2004.

### III. Opinion and Basis

I have carefully reviewed the arguments in the New York Review of Books by Richard Dorment (22 October, 2009) and Rainer Crone (25 February, 2010). For purposes of this report, I have relied on the facts as they have stated them. I am advised that Dr. Crone testified as a witness in these cases and that he testified in a manner consistent with his argument in the New York Review of Books. The series at issue has undeniable reasons for being authentic.

In modern art since the beginning of the 20th century, there have been various examples of artists who produced artworks that are not fully or not at all handmade. Some examples are the artists Marcel Duchamp, Henry Moore, Donald Judd, and Lawrence Weiner among many others. The argument, that the work is not made by the artist or in the presence of the artist is irrelevant, and can't be a decisive criteria for the authenticity of an artwork, especially not with Andy Warhol's works, as is also laid out clearly by Crone.

It has been part of Warhol's revolutionary artistic concept to delegate the execution of works to his assistants, and it is not uncommon that he was not present when works were executed, this includes also many (probably most) of the works produced in his studio (that – for good reasons - was called "The Factory"). This includes also a procedure as with the series of "Red Self Portraits", executed by a silkscreen company, with telephone instructions by Andy Warhol.

Within the production process of artworks in other media, like graphic prints or bronze sculptures, it is actually quite common, that the artist is not present, but transfers his drafts or drawings to a craftsman, but the artist controls the result and authorizes the work by signing it.

At this point it might be interesting to note, that of the Self-Portraits (I am advised that there are approximately 12 paintings in this series and that the Warhol defendants have examined 10) with the same image from 1964 (as listed in the artist's catalogue raisonné "Warhol, Paintings and Sculptures 1964-1969, vol. 02A, Phaidon Publisher, London 2004, cat. nos. 1244-1253) three of them are also dedicated and signed, and most likely given away as gifts (nos. 1245, 1246, 1247), and at least four others are not signed at all (nos. 1248, 1250, 1252, 1253). Therefore the information, that Warhol designed the works from the Ekstract-series from 1965 as gifts, does not argues against their character as by the artist authorized works.

When Warhol was doing prints in editions with his printer Rupert Jason Smith, he was surely not present during the printing process.

A key fact to distinguish authentic from inauthentic works, is the information if Warhol controlled and confirmed the result from the production process at the silkscreen company and authorized the work by signing it or by some other way (e.g. presenting a work in one of his exhibitions). The signature, as also carried out by Crone, is a decisive issue, with whom the artist confirms the authenticity of the work. I do not believe that Warhol personally signed all works from the 1965 series of "Red Self-Portraits". This, however, is not the final decisive point, as at least four from the 1964 series are unsigned and had been approved by the Authentication Board.

I understand, that the painting owned by Mr. Simon-Whelan is unsigned, but was authenticated by the Warhol estate. I would therefore consider this painting an authentic work by Andy Warhol. I understand the painting owned by Ms. Shear was produced in the same way and under the same circumstances as the paintings by Mr. Simon-Whelan and the Bischofberger-work, as well as the other Ekstract-self-portraits. I therefore see strong evidence, that this painting (Shear) is also an authentic work by the artist Andy Warhol. I have not examined these paintings in the original, but plan to do so.

With the "Red Self-Portrait" dedicated to Bruno Bischofberger the situation is slightly different in some points, but therefore seems to be more clear: Warhol signed and dedicated the "Red Self Portrait" to his most important European dealer Bruno Bischofberger from Zurich. Although the signature dates to "1964" the work was surely inscribed later, as both men had only met later.

But even more: After the execution of the Bischofberger "Red Self-Portrait" in 1965, it appears likely that Warhol kept the work in his studio, he became familiar with it, signed it, dedicated it, and placed its illustration prominently on the cover of his first catalogue raisonné, a publication that was without any question an important book for him to establish his range as a major contemporary artist. If he would have had any doubt about the quality or authenticity of this work, he could have easily chosen another image for the cover of this book. Probably he had chosen this one, because it had a more fabricated character than a portraits from the first series from 1964. From his artistic concept he had surely liked the more fabricated character of this version more than the earlier (1964) ones. It fulfilled more his artistic concept of "an artist as a machine", as he had once described his unique working process.

Later in 1986 he signed the book from 1970 with this image on the cover in the presence of his London dealer Anthony d'Offay. It is unlikely that he would have done this, if he would have any doubts about or objections against this painting.

3

I have not testified as an expert at any trial or deposition within the past four years. As for compensation, I have decided not to charge for my time in this matter.

My work in this matter is ongoing. My opinions are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, additional documents and data, and/or further analysis of the data and materials described above.

_____          _____
Dr. Dietmar Elger                                        August 9, 2010

# EXHIBIT B

**SARAH WHITFIELD**
**ART HISTORIAN**
8 Eyot Gardens
London W6 9TN
United Kingdom

## PRELIMINARY REPORT CONCERNING
## PROCEDURES OF ART AUTHENTICATION

**Prepared for**

The attorneys for Joe Simon-Whelan and Susan Shaer in the related litigations against the Andy Warhol Foundation for the Visual Arts, Inc., the Andy Warhol Art Authentication Board, Inc., Vincent Fremont and the Estate of Andy Warhol.

**SARAH WHITFIELD**
**ART HISTORIAN**


Re:   **Simon-Whelan v. The Andy Warhol Foundation for the Visual Arts Inc. et al**
      **Shaer v. The Andy Warhol Foundation for the Visual Arts, Inc., et al.**

## Assignment

I have been asked by the attorneys for Joe Simon-Whelan and Susan Shaer to provide my opinions, and the basis thereof, primarily on the following matters: (1) general authentication procedures within the contemporary art market, based upon my experience; and (2) my opinion as to the defendants' authentication practices.

This document should be considered a preliminary report for several reasons. Primarily, I was faced with an extraordinarily short deadline for the completion of this report. While this preliminary reports does summarize my opinion as to general authentication procedures, I have not yet had sufficient time to review necessary materials to provide an opinion as to defendants' authentication procedures. Due to the deadline in the two cases, I am submitting this report with the understanding that I retain the right to amend it after review of relevant information. This report is intended to be used in connection with the litigations, and not for any other purpose. I am not being compensated for my services.

## Background to this Report

Prior to my retention, I had followed aspects of Mr. Simon-Whelan's case and the red self-portrait series as reported in the New York Review of Books. Because I was uneasy with the practice of defacing works of art, I submitted a letter which was published along with other correspondence concerning this matter. After I was retained on Friday, August 6, 2010, I was supplied with various materials and was able to review some documents and other materials relating to the case as of the date of this report together with one of plaintiffs' lawyers (Seth Redniss). I was able to conduct an initial review of the following:

The amended complaint filed by Joe Simon-Whelan;

The amended complaint filed by Susan Shaer;

Portions of deposition transcripts of multiple fact witnesses in the cases;

Documentation obtained by plaintiffs in discovery concerning the activities of Andy Warhol Foundation for the Visual Arts, Inc. (the "Foundation"), the Andy Warhol Art Authentication Board, Inc. (the "Authentication Board"), Vincent Fremont and the Estate of Andy Warhol (the "Estate"); and

Information summarized for me by plaintiffs' attorney.

Following the submission of this report, I will endeavor to review all relevant materials sufficiently. For the avoidance of any doubt, I myself have no experience in authenticating individual Warhol artwork and my opinions will be limited to my experience of sitting on authentication committees and working on catalogue raisonnés.

## Qualifications

I am an independent art historian, writer and curator. I am the co-author of the René Magritte Catalogue Raisonné and a member of the Comité Magritte, which is the authentication committee set up by the Fondation Magritte in 2000. I am also a member of the board of the Arshile Gorky Foundation and serve on the authentication committee for the Estate of Francis Bacon. I am currently editing the Catalogue Raisonné of William Scott, under the auspices of the William Scott Foundation. I have also organized include Magritte (Hayward Gallery, London, 1992, Metropolitan Museum, New York, Art Institute, Chicago), Pierre Bonnard (Tate Gallery, 1998, Museum of Modern Art, New York), Lucio Fontana (Hayward Gallery, 2000) and Malcolm Morley (Hayward Gallery, 2001). I served as Chair of The Elephant Trust and I am a Founder Member of the Joanna Drew Travel Bursary.

## Summary of Opinions

In my opinion, art authentication procedures should be guided by two key principles:

- **First**, works of art should never be mutilated or marked in an irreversible manner as part of the authentication process;

  and

- **Second,** authenticating bodies (including authentication committees and catalogue raisonnés) should be independent from the commercial art market (including dealers and auction houses) on every level.

## Basis of the Opinions

### Point 1: Authentication decisions should be "opinions" that are subject to change.

Art works should never be mutilated. I am unaware of any current authentication committee that stamps works denied, except for the Andy Warhol Art Authentication Board, Inc. More important is the reason why works should never be irreversibly marked. Authentication decisions are intended to be "opinions." Opinions may change, as scholarship changes and additional information becomes available. In the case of the Andy Warhol Art Authentication Board, Inc., the practice of physically stamping works

"denied" suggest that its authentication decisions are not open to revision so much opinions as statements of fact.

**Point 2: For maximum credibility, authentication procedures should ideally be independent from the market on every level.**

Authentication occurs primarily through authentication committees and catalogue raisonnés, which are often intimately connected. In order that a decision of authenticity to have maximum credibility, in my opinion, it is critical that such decisions are as far removed from the market as possible. The more a dealer is seen to be involved, the more the integrity of the authenticating body could potentially be subject to criticism. When a work is presented to an authentication committee or catalogue raisonne, those concerned should have the freedom to give a negative opinion or to admit they do not know whether or not a work is authentic.  An authentication committee or catalogue raisonné should have the freedom to say "no" or "we don't know." In addition, authentication bodies should be open to scrutiny and offer total transparency as to its procedures.

Authentication decisions should be based upon a set of criteria established by independent experts. Where possible, these decisions should include information from experts who are familiar with the artist's practices. The value of a particular work (whether $1 or $100,000,000) should not be relevant to an authentication decision. In reality, however, the market can grow "agitated" and – auction houses in particular -- can exert pressure when a decision is needed in order for a commercial transaction to be concluded. For example, auction houses regularly contact authentication committees requesting an immediate opinion so that a work can be sold. With many artists, a work cannot be sold at auction unless it has been authenticated by the relevant authenticating body. No matter how unscientific this process appears to be, it is how the market works.

Another best practice is to control and be transparent with respect to the compensation paid to the people providing authentication-related services. For example, for my work with the Gorky Foundation and the Bacon Estate, I receive an honorarium of $1,500 per meeting (plus expenses). For my work with the Comité Magritte, I simply receive an expense reimbursement for the two meetings held per year.

I have not previously testified as an expert at any trial or deposition at any time. My work in this matter is ongoing, and as stated above, my opinions are subject to revision and amendment based on my analysis of information that has and will be provided to me, including the opinions of other experts.

Sarah Whitfield

August 9, 2010